**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| Plaintiff, | : | Case No.  2:21-cr-252 |
| vs. | : | JUDGE SARGUS |
| JAMES SABOLICK | : | |
| Defendant. | : | |

**JAMES SABOLICK'S SENTENCING MEMORANDUM**

## I. INTRODUCTION

On January 9, 2024, James Sabolick (hereafter "James" or "Mr. Sabolick" alternately) entered a plea of guilty to Counts 3, 5, and 10 of a Superseding Indictment filed in the Southern District of Ohio. Counts 3 and 5 charged Mr. Sabolick with Sexual Exploitation of a Minor per 18 U.S.C. §§2251(a) and (e). Count 10 charged Mr. Sabolick with Possession of Child Pornography per 18 U.S.C. §§2252(a)(4)(B) and (b)(2). The Court is tasked with imposing "a sentence sufficient, but not greater than necessary," to vindicate Congress' sentencing mandate, set forth in 18 U.S.C. § 3553(a)(2). The Court must begin sentencing proceedings by first correctly calculating the applicable guideline range. *Gall v. United States*, 128 S. Ct. 586, 596 (2007). However, this guideline range is only "the starting point and the initial benchmark." The Court "may not presume that the guideline range is reasonable." *Id.* at 596-97. A sentencing court is "free to make its own reasonable application of the 18 U.S.C. § 3553(a) factors, and to reject

1

(after due consideration) the advice of the guidelines." *Kimbrough v. United States*, 552 U.S. 85, 113 (2007) (Scalia, J., concurring). "[E]xtraordinary circumstances [are not required] to justify a sentence outside of the guidelines range." *Gall* at 595.

## II.     SENTENCING FRAMEWORK

Per the calculation by the U.S. Probation Office, Mr. Sabolick has an offense level of 43 and a Criminal History Category of I. At these parameters, the advisory guideline range is a sentence of 360-840 months incarceration. There are no objections from the parties.

The parties do have an agreement pursuant to F.R.C.P. 11(c)(1)(C), calling for a period of imprisonment of 300 months and a lifetime of supervised release. The agreement further calls for various mandatory conditions and other discretionary options for the Court to impose as well as restitution.

**With this framework in mind, Mr. Sabolick urges this Court to adopt the agreement crafted by the Government and Mr. Sabolick after a lengthy negotiation process.** The parties recognize that while the requested sentence falls below the calculated advisory guideline range for these serious offenses, the sentence reflects a lengthy two-and-a-half decade sentence that, at 59 years old, may very well become a de-facto life sentence for Mr. Sabolick[1]. With its fixed amount of incarceration and appellate waiver, the agreed upon sentence has already begun to provide a degree of finality and closure to all parties involved in the matter. Perhaps most of all, the agreed upon sentence negates the need for the victims and witnesses to relive the trauma

---

[1] This is particularly the case given Mr. Sabolick's Type 2 Diabetes. Per the National Institute of Health, people with Type 2 Diabetes live on average 6 years less than those without diabetes. *Life Expectancy Associated with Different Ages at Diagnosis of Type 2 Diabetes in High-Income Countries: 23 Million Person-Years of Observation.*

2

derived from having to testify at one or more trials spanning evidence from multiple countries.

In short, the 300 months of incarceration requested would adequately reflect the seriousness of his offense, promote respect for the law and provide just punishment. "It is appropriate for a court, when considering the type of sentence necessary to protect the public and deter future misconduct, to note the length of any previous sentences imposed. Generally, a lesser period of imprisonment is required to deter a defendant not previously subject to lengthy incarceration than is necessary to deter a defendant who has already served serious time yet continues to re-offend." *United States v. Pelloski*, 31 F. Supp. 3d 952, 962 (S.D. Ohio 2014) (quoting United States v. Qualls, 373 F. Supp. 2d 873, 877 (E.D. Wis. 2005)).

### III.   SENTENCING FACTORS—18 U.S.C. § 3553(a).

The final step of the sentencing analysis requires this Court to determine what sentence is sufficient, but not greater than necessary, to satisfy Congress' sentencing mandate. Counsel points to the following three § 3553(a) factors to answer this statutory question: (1) Mr. Sabolick's history and characteristics; (2) the nature and circumstances of the offense and (3) the sentencing range called for by the plea agreement. In the end, counsel submits that a sentence of 300 months would vindicate Congress' sentencing mandate as it would not diminish the seriousness of his offense, and would provide just punishment, adequate deterrence and protection of the public.

### a. JAMES SABOLICK'S HISTORY AND CHARACTERISTICS—§ 3553(a)(1).

On some level, it is hard to pin down exactly how James Sabolick got to this point where at nearly 60-years-old, he faces a 25-year-long prison sentence. At first glance, James's life appears somewhat ordinary and devoid of many of the ACE factors typical in defendants with these kind of offenses. He was born into a two-parent home to James Sr. and Bonnie Berga. His parents both worked and provided for James and his sister financially, and they were loving, supportive parents. While by no means rich, they were able to provide an enriching and caring rural environment in which James spent his childhood.

That being said, there were concerns about James from his parents as he was entering into his teenage years. While James was a loving child, they recognized a certain darkness within him. Bonnie and James Sr. went as far as having James see a child psychologist sometime in the late 70s. Perhaps it was because of the era in which James was seen or perhaps it was a lack of sophistication in the science at that time, but mental health professionals shrugged off his parents' concerns. No one can say for sure if proper intervention would have prevented all of this from happening, but certainly it might have given everyone insight into what was going with James, most of all James himself.

As it were, as James grew older, he maintained a constant yet subtle struggle to live up to his potential and fit into the norms of society. For instance, James is a very well read and intelligent person, yet he struggled academically in high school. As he got older, James began managing a struggling convenience store. He takes great pride in having turned this store into the biggest earner in the region, but acknowledges his social skills and short temper prevented him

from advancing any further and ultimately cost him his job. These were just a few of the examples of the one-step forward, two-steps back existence in which James seemed to find himself.

This dichotomy also fit into his relationships as well. While James had a number of relationships over the years (including a brief marriage), he could not maintain the proper social connections that would allow those relationships to develop in a healthy way. Again, whether this is a result of undiagnosed mental health issues[2] or other reasons, James has appeared to always struggle with appropriate dynamics in these settings. In part, this struggle to relate is what led James to go to the internet to seek out companionship overseas. Unfortunately, as we see now, this sent James down a deep rabbit hole that ultimately led us to where we are now.

Still, James is more than these struggles and the resulting crimes that he committed. To Bonnie, James has always been a loving son who helped her with meals and maintaining her property (upon which James lived) over the years. Throughout his life, James has always been a hard worker, either maintaining a job or building up his own small construction company. Counsels' various lengthy conversations with James reveal a man with a wide range of interests and an uncommon intellectual curiosity. Should the Court accept this plea agreement, James will spend this time (with the help of the BOP) using that curiosity to look inward and try to understand how he got to this point.

---

[2] While by no means an expert in the field, counsel would not be surprised, if/when James is fully evaluated, he is diagnosed with some variation of Autism Spectrum Disorder.

5

**b. NATURE AND CIRCUMSTANCES OF THE OFFENSE; THE SENTENCING RANGE ESTABLISHED BY THE SENTENCING GUIDELINES; THE NEED TO AVOID UNWARRANTED SENTENCING DISPARITIES—§§ 3553(a)(1) and (a)(4).**

<u>Nature and circumstances of the offense</u>

Again, no one would ever suggest that the crimes James committed were anything less than heinous, least of all him. As the Pre Sentence Report lays out the details of the offenses with great specificity, Mr. Sabolick will neither rehash them here nor will he attempt to minimize his behaviors. James recognizes that he has caused profound and potentially everlasting damage to the lives he has touched in these cases, and he knows he will never have the capacity to undo the damage. Rather, it will be up to these victims' own internal strength to heal. While it may seem trite to say, James genuinely is remorseful that he has placed this lifelong burden on those victims.

However warped and misguided his mindset may have been, he did carry at least a degree of what he felt was genuine affection for these individuals, particularly Victim 3. A listen to the interview James gave to law enforcement shortly after his arrest confirms this duality, a knowledge that what he did was wrong coupled with what appears to be his belief of being in a relationship with Victim 3. There is a recognition on James's part since his arrest as to just how wrong his behavior and mindset have been. He has made no attempts to make contact with any of the victims (or their families) in this case and has no intention of doing so in the future. While this Court will undoubtedly put restrictions on his ability to contact any of the victims, James

6

recognizes that it is the absolute very least he can do to help with their healing processes.

All that James can ask this Court to do now is to recognize that even the most egregious of circumstances require an application of nuanced context, as difficult as it may be. The time James has had to reflect on his past, his behaviors leading to these offenses, and the underlying issues that fueled these sensibilities and behaviors all provide some insight into how a man who went from having basically never had legal trouble in his life to spending the vast majority of the remainder of his life in prison. James will take this time to engage in whatever programming may be available to him to explore the underlying root causes of his behaviors, and he will seek out the treatment necessary to address these internal issues.

   c. **A PERIOD OF 300 MONTHS PROVIDES JUST PUNISHMENT AND DOES NOT DIMINISH THE SERIOUSNESS OF HIS OFFENSE AND PROVIDES ADEQUATE DETERRENCE AND PROTECTION OF THE PUBLIC—§§ 3553(a)(2)(A)-(C).**

Prior to these events, James had never been in trouble other than a non-significant misdemeanor. Now, at 59 years old, he stands to spend more than two decades in prison on top of the time he has already served. The requested sentence is greater than the mandatory minimum penalty this Court would have been authorized to administer without the binding agreement, and the requested sentence obviously reflects a significant amount of time that James will be incarcerated. In that amount of time, all of the minors who were filmed will have long since become adults living their own lives. Only time will tell the extent of the damage James did to these victims through his actions.

One thing James and the Government do agree on is the need for treatment. While it's best left to medical professionals at the BOP to determine to what extent he needs sex offender

treatment, it is understood that he could not only benefit from a SOMP program, but he absolutely needs treatment for the underlying mental health issues that are at the heart of this offense. James, from the outset, has been committed to doing everything in his power to work on these internal struggles. He has not been doing this in the hopes of getting leniency from this Court. James does this now because he knows that he if he ever hopes to have anything resembling a meaningful life moving forward, he must understand himself fully.

In addition to the requested period of incarceration, the plea agreement calls for a (natural) lifetime imposition of supervised release, and James understands the need for this provision. James will be subject to all of the standard conditions of supervised release in this district, as well as special conditions (particularly mental health treatment) that the Court may choose to impose. If he violates the terms of supervised release, he may be further imprisoned. Cumulatively, these factors will adequately protect the public from any future crimes that James might contemplate. For his part, James recognizes that regardless of the amount of rehabilitative progress he makes in prison, he would benefit from ongoing counseling long after he is released from prison.

In this matter, James has been incarcerated since July of 2021. That could have been three years of James beating himself up about how he got to this place in his life: about being labelled a sex offender, losing his property, losing his family, and looking at spending much more time incarcerated. That's not what has happened. James has accepted that there are circumstances in his past and in his present that he cannot change, but he recognizes that he can work to ensure that he does not repeat past choices. James also recognizes that while he has begun the hard work

to rehabilitate, he cannot do it alone. When it's all said and done, the extensive treatment James will committed to over the years at the BOP will be particularly instrumental in making sure he does not engage in this behavior again. Specifically, he asks this Court to recommend that he be placed at the SOMP program at Elkton FCI.

Furthermore, the 300 months of incarceration will have an adequate deterrent effect both on James and upon others who are similarly situated and might engage in similar conduct. To be an effective deterrent, the sentence must not only educate defendants as to the seriousness of the offense, but should make others in the community "aware that similar actions will be punished." *United States v. Coleman*, 370 F. Supp. 2d 661, 681 (S.D. Ohio 2005), rev'd on other grounds, *United States v. White*, 551 F.3d 381 (6th Cir. Ky. 2008). Again, what will most ensure that James does not engage in this conduct again is the sexual offender treatment and mental health programming he can receive at the BOP and that this Court can provide him if he lives long enough to be released and eventually placed on supervised release. James has made up his mind to become a changed man. He now asks this Court to help him make that change.

Data shows that long prison sentences do little to deter people from committing future crimes. Dep't. of Justice, Office of Justice Programs, Nat'l Institute of Justice, *Five Things About Deterrence* (available at http://nij.gov/five-things/pages/deterrence.aspx). Viewing the findings of research on severity effects in their totality, there is evidence suggesting that short sentences may be a deterrent. However, a consistent finding is that increases in already lengthy sentences produce at best a very modest deterrent effect. *Id.* In fact, lengthy prison sentences may exacerbate recidivism. *Id.* "Decisions to refrain from crime are based on the mere knowledge that the behavior

9

is legally prohibited or for other non-legal considerations such as morality or fear of social sanctions."[1] In addition, "certainty of apprehension and not the severity of the legal consequence ensuing from apprehension is the more effective deterrent."[2]

Finally, deterrence of others and the need to avoid unwarranted sentencing disparities are important in matters of this ilk. This 300-month sentence certainly sends the message to other like-minded individuals that even a below-guideline sentence can and will have severe consequences.

There are no winners and losers in this case. These victims will forever be psychologically scarred to varying degrees as a result of James's crimes. James understands that he should and will be punished for those behaviors, and by agreeing to this lengthy sentence, that is exactly what he is asking this Court to do. In the end, James Sabolick will continue to do everything he can to make amends for what he has done to these victims, his family, and to himself. He now asks this Court to find that the better part of two and a half decades in a federal prison is a suitable time to work on these things while adequately punishing him for his actions.

**IV.     CONCLUSION.**

In light of his history and characteristics, the nature and circumstances of this offense, and the sentencing range established for this offense, James Sabolick respectfully requests a sentence of 300 months. Mr. Sabolick submits that this sentence is sufficient, but not greater than necessary, to punish him for his offense, deter others, and to protect the public.

Respectfully submitted,

JOSEPH MEDICI
FEDERAL PUBLIC DEFENDER

　　/s/   Soumyajit Dutta
Soumyajit Dutta (OH 76762)
Assistant Federal Public Defender
Office of the Federal Public Defender
10 West Broad Street, Suite 1020
Columbus, Ohio   43215-3469
Telephone: (614) 469-2999
Facsimile: (614) 469-5999
Soumyajit_Dutta@fd.org
*Attorney for Defendant*
*James Sabolick*

**CERTIFICATE OF SERVICE**

    I hereby certify that I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record on the date of filing.

                                                     /s/ Soumyajit Dutta
                                                     Soumyajit Dutta (OH 76762)
                                                     Soumyajit_Dutta@fd.org